## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ROBERT PILOCO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 1:18-cv-00280-LPS |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JUNO THERAPEUTICS, INC., HAL BARRON, HANS BISHOP, THOMAS DANIEL, ANTHONY EVNIN, JAY FLATLEY, RICHARD KLAUSNER, ROBERT NELSEN, HOWARD PIEN, RUPERT VESSEY, and MARY AGNES WIDEROTTER, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

III.  PLAINTIFF AND SEMBHI'S COUNSEL ARE ENTITLED TO REASONABLE FEES
      AND EXPENSES UNDER THE COMMON BENEFIT DOCTRINE ............................... 2

      A.   The Supplemental Disclosures Benefited Juno Stockholders ......................... 5

           1.   Management's Financial Projections ........................................................6

           2.   Crucial Metrics Clarifying Morgan Stanley's Discounted Cash Flow and Illustrative
                Sum-of-the-Parts Discounted Cash Flow Analysis.....................................6

           3.   Morgan Stanley's Premiums Paid Analysis...............................................9

           4.   The Process Leading Up to the Merger Agreement..................................10

      B.   Plaintiff's Mooted Disclosure Claims Were Meritorious When Filed.......................... 11

      C.   Plaintiff's  Counsel's  Fee  Motion  Should  Be  Approved  in  Full  Under  a
           Lodestar/*Johnson* Factors Analysis ............................................................... 12

           1.   The Time and Labor Required...............................................................13

           2.   The Customary Fees in Similar Cases ...................................................15

           3.   The Results Obtained, the Skill Requisite to Perform the Legal Service Properly,
                the Novelty and Difficulty of the Question Presented by the Case, the Preclusion of
                Other Employment, and Time Limitations ..............................................16

           4.   The Experience, Reputation, and Ability of the Attorneys.......................18

           5.   A Reasonable Multiplier is Appropriate Because Plaintiff's Counsel Undertook
                Representation on a Contingent Basis ...................................................18

IV.   CONCLUSION.................................................................................................... 20

## Table of Authorities

**Cases**                                                                                           **Page(s)**

*In re Aetna Inc. Sec. Litig.*,
   No. CIVIL ACTION MDL NO. 1219 (All Cases), 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4,
   2001) ................................................................................................................................ 19

*Alaska Elec. Pension, Fund v. Brown*,
   988 A.2d 412 (Del. 2010) ................................................................................................ 5

*Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores*,
   54 F.3d 69 (2d Cir. 1995) ................................................................................ 3-4, 12, 16-17

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) ........................................................................................ 14

*Azar v. Blount Int'l, Inc.*,
   No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017) ........................ 6

*Barton v. Drummond Co.*,
   636 F.2d 978 (1981) ........................................................................................................ 5

*Blau v. Rayette-Faberge, Inc.*,
   389 F.2d 469 (2d Cir. 1968) ............................................................................................ 4

*Brown v. Brewer*,
   No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) .... 12

*In re Celera Corp. S'holder Litig.*,
   No. 6304-VCP, 2012 Del. Ch. LEXIS 66 (Del. Ch. Mar. 23, 2012) ................................ 10-11

*Chrapliwy v. Uniroyal, Inc.*,
   670 F.2d 760 (7th Cir. 1982) ............................................................................................ 14

*Chrysler Corp. v. Dann*,
   223 A.2d 384 (Del. 1966) ................................................................................................ 11

*City of Providence v. Aéropostale, Inc.*,
   No. 11 Civ. 7132 (CM) (GWG), 2014 U.S. Dist. LEXIS 64517 (S.D.N.Y. May 9, 2014) ... 14

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................................................ 17

*In re Computron Software*,
   6 F. Supp. 2d 313 (D.N.J. 1998) ...................................................................................... 19

*Cooperstock v. Pennwalt Corp.*,
   820 F. Supp. 921 (E.D. Pa. 1993) ................................................................... 5, 11

*Denton v. Pennymac Loan Servs., L.L.C.*,
   No. 4:16cv32, 2017 U.S. Dist. LEXIS 74037 (E.D. Va. May 12, 2017) .............................. 17

*Glassman v. Wometco Cable TV, Inc.*,
   No. 7307, 1989 Del. Ch. LEXIS 1 (Del. Ch. Jan. 6, 1989) ...................................... 9

*In re Golden State Bancorp Inc. S'holders Litig.*,
   No. 16175, 2000 Del. Ch. LEXIS 8 (Del. Ch. Jan. 7, 2000) ..................................... 2

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) .................................................................... 12

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175 (S.D.N.Y. Dec. 19, 2014) ............. 14

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964) ............................................................................. 16

*In re Johnson & Johnson Derivative Litig.* ,
   No. 11-2511(FLW), 2013 U.S. Dist. LEXIS 180822 (D.N.J. June 13, 2013) ...................... 14

*Kahan v. Rosenstiel*,
   424 F.2d 161 (3d Cir. 1970) ............................................................... 4, 11, 12

*Kinney v. Int'l Bhd. of Elec. Workers*,
   939 F.2d 690 (9th Cir. 1991) ................................................................... 13

*Kopet v. Esquire Realty Co.*,
   523 F.2d 1005 (2d Cir. 1975) .................................................................... 4

*Koppel v. Wien*,
   743 F.2d 129 (2d Cir. 1984) .................................................................. 3, 5

*Krell v. Prudential Ins. Co. of Am.*,
   148 F.3d 283 (3d Cir. 1998) .................................................................... 12

*Lewis v. Anderson*,
   692 F.2d 1267 (9th Cir. 1982) .................................................................. 11

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.* ,
   540 F.2d 102 (3d Cir. 1976) .................................................................... 19

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.* ,
  487 F.2d 161 (3d Cir. 1973) ............................................................................. 13

*Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*,
  11 A.3d 1175 (Del. Ch. 2010) ........................................................................... 7

*McCafferty v. Local 254, SEIU*,
  186 F.3d 52 (1st Cir. 1999) ............................................................................... 13

*McKittrick v. Gardner*,
  378 F.2d 872 (4th Cir. 1967) ............................................................................. 19

*In re Merrill Lynch & Co. Research Reports Sec. Litig.* ,
  No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Jan. 31, 2007) ............... 14

*In re Microstrategy, Inc.*,
  172 F. Supp. 2d 778 (E.D. Va. 2001) ................................................................. 20

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ..................................................................................... 1, 3

*In re Netsmart Techs., Inc. S'holders Litig.*,
  924 A.2d 171 (Del. Ch. Mar. 14, 2007) .............................................................. 6

*Perdue v. Kenny A.*,
  559 U.S. 542 (2010) .................................................................................. 12, 13

*Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions v. Prudential Ins. Co. of Am.*,
  148 F.3d 283 (3d Cir. 1998) .............................................................................. 13

*In re Ravisent Techs., Inc. Sec. Litig.*,
  No. 00-CV-1014, 2005 U.S. Dist. LEXIS 6680 (E.D. Pa. Apr. 18, 2005) ...................... 19

*Reinhart v. Lucent Techs., Inc.*  (*In re Lucent Techs., Inc. Sec. Litig.*),
  327 F. Supp. 2d 426 (D.N.J. 2004) .................................................................... 14

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) ......................................................................... 13, 19

*Rudel Corp. v. Heartland Payment Sys.*,
  No. 16-2229, 2018 U.S. Dist. LEXIS 10636 (D.N.J. Jan. 22, 2018) ........................... 14

*In re Schering-Plough/Merck Merger Litig.*,
  No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 25, 2010) . 4, 17, 18, 20

*SEC v. Mayhew,*
   121 F.3d 44 (2d Cir. 1997) ............................................................................ 6

*SEC v. Nat'l Student Mktg. Corp.,*
   457 F. Supp. 682 (D.D.C. 1978) ..................................................................... 6

*Skelton v. Gen. Motors Corp.,*
   860 F.2d 250 (7th Cir. 1988) .................................................................. 4, 20

*Smith v. Robbins & Myers,*
   969 F. Supp. 2d 850 (S.D. Ohio 2013) ..................................................... 7, 12

*Souryavong v. Lackawanna County,*
   872 F.3d 122 (3d Cir. 2017) ........................................................................ 12

*Steiner v. Hercules, Inc.,*
   835 F. Supp. 771 (D. Del. 1993) .................................................................. 14

*In re Suprema Specialties, Inc. Sec. Litig.,*
   No. 02-168 (WHW), 2008 U.S. Dist. LEXIS 26572 (D.N.J. Mar. 31, 2008) ....... 19

*In re Telik, Inc. Sec. Litig.,*
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) .......................................................... 14

*United Vanguard Fund, Inc. v. Takecare, Inc.,*
   727 A.2d 844 (Del. Ch. 1998) ........................................................................ 5

*Vizcaino v. Microsoft Corp.,*
   290 F.3d 1043 (9th Cir. 2002) ...................................................................... 18

*In re Xoom Corp. Stockholder Litig.,*
   No. 11263-VCG, 2016 Del. Ch. LEXIS 117 (Del. Ch. Aug. 4, 2016) .................. 2

*Yablonski v. United Mine Workers,*
   466 F.2d 424 (D.C. Cir. 1972) ........................................................................ 4

**Other Authorities**

Steven M. Davidoff, *Fairness Opinions,*
   55 Am. U. L. Rev. 1557 (2006) ............................................................... 7, 8, 9

## I.   INTRODUCTION

Plaintiff Robert Piloco ("Plaintiff"), respectfully submits this Memorandum of Law in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Expenses (the "Fee Motion").[1]  As a result of Plaintiff's litigation efforts, with the assistance of Sembhi and his counsel, Defendants disseminated certain material information regarding the tender offer by Celgene Corporation ("Celgene") through its wholly-owned subsidiary, Magpie Corporation ("Merger Sub"), to acquire all of the issued and the outstanding shares of Juno Pharmaceuticals, Inc. ("Juno" or the "Company") (the "Tender Offer", as described in detail below) that had been omitted from the initial iterations of the Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement"), Exhibit 1 to the Declaration of Blake A. Bennett in Support of Plaintiff's Motion ("Bennett Dec."),(the "Supplemental Disclosures")(Bennett Dec. Ex. 2).[2]  The Supplemental Disclosures provided Juno stockholders with material information that will enable them to properly assess the fairness of the Tender Offer and the valuation analyses performed by Juno's financial advisor.   Plaintiff and Sembhi therefore conferred a substantial benefit upon all Juno stockholders, entitling Plaintiff's Counsel to an award of fees and expenses.  *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970)[3].

---

[1]   Plaintiff Amardeep Sembhi ("Sembhi") filed a related action in the Western District of Washington, styled *Sembhi v. Juno Therapeutics, Inc., et al.*, 2:18-cv-00229(the "Sembhi Action").   Pursuant to Plaintiff's Stipulation and [Proposed] Order Withdrawing Motion for Preliminary Injunction, Dismissing Action and Setting Schedule for Plaintiff's Counsel's Application for an Award of Attorneys' Fees and Expenses filed on February 26, 2018 (Dkt. No. 6), this Court would retain over Plaintiff's Fee Application. Sembhi's litigation efforts contributed to the Substantial Benefit conferred upon all Juno stockholders and, as a result, Sembhi joins Plaintiff's Motion for an Award of Attorneys' Fees and Expenses.

[2]   The Supplemental Disclosures were disseminated to Juno stockholders via a Form 14D9/A filed with the U.S. Securities and Exchange Commission ("SEC") on February 20, 2018.

[3]   All internal citations and alterations have been omitted, and all emphasis added, unless otherwise noted.

Plaintiff has attempted to resolve the instant Fee Motion with Defendants, and will continue to attempt to do so, however, in order to preserve all rights and to ensure Celgene is aware of the liabilities it assumes by acquiring Juno, Plaintiff is filing his Fee Motion before the Expiration Date (as defined below) to preserve all rights.

## II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and Sembhi challenged the Tender Offer and its Recommendation Statement. As a result of Plaintiff and Sembhi's litigation efforts, on February 20, 2018, Defendants filed the Supplemental Disclosures with the SEC, which disclosed previously withheld material information regarding: (i) the Company's financial projections; (ii) the inputs and assumptions underlying Morgan Stanley's financial analyses; and (iii) the process leading up to the Merger Agreement. *See* Exhibit 2 to the Bennett Dec.

A complete set of facts are outlined in the Bennett Dec., which is incorporated hereto by reference.  Pursuant to the stipulation, the Court has retained jurisdiction to consider the Fee Motion, which is now filed prior to the Expiration Offer to preserve all rights.

## III.  PLAINTIFF AND SEMBHI'S COUNSEL ARE ENTITLED TO REASONABLE FEES AND EXPENSES UNDER THE COMMON BENEFIT DOCTRINE

Plaintiff and Sembhi's Counsel are entitled to the requested Fee Motion because their efforts conferred a "substantial" or "common" benefit on the members of an ascertainable class, and the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.[4]  *Mills*, 396 U.S. at 396.

---

[4] Juno is incorporated in Delaware and therefore reference to Delaware corporate law is proper. As demonstrated herein, the relief sought in this Fee Motion is proper also under Delaware law. Further, in the mootness context, "a fee can be awarded if the disclosure provides some benefit to stockholders, whether or not material to the vote.  In other words, a helpful disclosure may support a fee award in this context."  *In re Xoom Corp. Stockholder Litig.*, No. 11263-VCG, 2016 Del. Ch. LEXIS 117, at *10 (Del. Ch. Aug. 4, 2016); *In re Golden State Bancorp Inc.*

In *Mills*, the Supreme Court held that vindicating Section 14's statutory policy of "informed corporate suffrage" confers a substantial benefit upon stockholders sufficient to warrant awarding attorney's fees. 396 U.S. at 396.  As the Supreme Court explained:

> In many suits under § 14 … it may be impossible to assign monetary value to the benefit. Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders…Private stockholders' actions of this sort involve corporate therapeutics, and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute.

*Id.*

Further, the Supreme Court in *Mills* explained that requiring a corporation to pay plaintiff's attorney's fees is the proper way to spread the costs proportionately among the benefitting stockholders, as doing so "is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them and that would have had to pay them had it brought the suit."  396 U.S. at 396-97.

Since *Mills*, it has become "well established that non-monetary benefits, such as promoting fair and informed corporate suffrage…may support a fee award." *Koppel v. Wien*, 743 F.2d 129, 134 (2d Cir. 1984).  "[T]he promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue." *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores*, 54 F.3d 69, 72 (2d  Cir. 1995); *see also Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir.

---

*S'holders Litig.*, No. 16175, 2000 Del. Ch. LEXIS 8, at *8 (Del. Ch. Jan. 7, 2000) (awarding fee of $500,000 and holding "it is enough that a reasonable Golden State stockholder might have considered the additional financials… of some interest in deciding how to vote.").

1975) (finding fee award warranted where litigation caused company to disclose financial statements).[5]

Further, "an award of plaintiffs' attorney's fees is not precluded because no judgment or consent decree was entered and the complaint was dismissed as moot.  Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained."  *Koppel*, 743 F.2d at 135.  Indeed, courts have awarded attorney's fees where the need for further litigation became moot because of concessions made by defendants in response to pre-litigation demand letters, *Blau v. Rayette-Faberge, Inc*., 389 F.2d 469, 474 (2d Cir. 1968), the filing of a complaint, *Kahan v. Rosenstiel*, 424 F.2d 161,164,175 (3rd Cir. 1970), and the filing of a preliminary injunction motion.  *Yablonski v. United Mine Workers*, 466 F.2d 424, 431 (D.C. Cir. 1972).  "Indeed, in *Mills* attorney's fees were awarded to the plaintiffs although it was not yet determined what relief if any plaintiffs could obtain." *Kahan*, 424 F.2d at 167.  As the D.C. Circuit explained in *Yablonski*:

> The Supreme Court in Mills [] noted that the relevant inquiry is not into the technical posture of the litigation, but whether it has conferred a substantial benefit on the members of an ascertainable class…As all lawyers know, a lawsuit does not always have to go to final adjudication on the merits in order to be effective. Assuming the effectiveness in terms of practical results, the litigating stage attained is relevant only to the amount of the fees to be allowed, and not to the issue of whether they should be awarded at all.[6]

466 F.2d at 431.

---

[5]     *See also In re Schering-Plough/Merck Proposed Merger Litig*., No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121, at *49 (D.N.J. Mar. 25, 2010) (awarding $3.5 million attorney's fee in disclosure-based settlement).

[6]     As set forth below, the early resolution of this action is reflected by counsel's lodestar.  *See Skelton v. General Motors Corp*., 860 F.2d 250, 258 (7th Cir. 1988) (noting that the early resolution of litigation "is reflected in the lodestar—plaintiffs' counsel worked fewer hours than they would have if the case had gone to trial.").

Defendants "bear the burden of production and persuasion on the issue of causation. Where, as here, plaintiffs' lawsuit is mooted by defendants' corrective action, the burden properly shifts to defendants to establish the absence of a causal connection in order to defeat a claim for legal fees." *Koppel*, 743 F.2d at 135; *Barton*, 636 F.2d at 985 (holding where shareholder's derivative suit has been rendered moot by subsequent action of the defendant, the latter has the burden of showing that there was no causal connection between the two in order to defeat the shareholder's claim for legal fees and expenses); *Cooperstock v. Pennwalt Corp.*, 820 F. Supp. 921, 925 (E.D. Pa. 1993) (same). Additionally, the common benefit does not need to flow *solely* from this litigation for Plaintiff and Sembhi's Counsel to be entitled to recover an award of attorney's fees and expenses.[7]

### A.      The Supplemental Disclosures Benefited Juno Stockholders

As noted above, the Supplemental Disclosures are comprised of four categories of information: (i) additional information concerning the Company's financial projections for the calendar years 2018 through 2035; (ii) crucial metrics clarifying Morgan Stanley's *Discounted Cash Flow Analysis* and *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*; (iii) Morgan Stanley's *Premiums Paid Analysis*; and (iv) additional information concerning the process leading up to the Merger Agreement. The disclosure of this information benefitted the Company's stockholders.

---

[7]      *See also Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010) ("Where, as here, a defendant takes action subsequent to the complaint that renders the claims asserted moot, Delaware law imposes on the defendant the burden to show that no causal connection existed between the initiation of the suit and any later benefit to the shareholders…to overcome this presumption, the Defendants must demonstrate that the lawsuit did not in any way cause their action."); *United Vanguard Fund, Inc. v. Takecare, Inc.*, 727 A.2d 844, 852 (Del. Ch. 1998) ("[T]he defendants bear the burden of demonstrating that there was *no* causal connection between the initiation of the lawsuit and any subsequent benefit to the shareholders. This is a heavy burden and it is to be expected that a defendant will not often be able to satisfy it.").

### 1.   Management's Financial Projections

The Supplemental Disclosures contain additional information concerning the Company's internal risk-adjusted and non-risk adjusted *November 2017* and *January 2018* Base Case, Upside Case, and Downside Case financial projections for the calendar years 2018 through 2035, including the components for Total Gross Profit, EBIT, and Net Income including NOL adjustments.  *See* Bennett Dec., Ex. 2.   Courts have consistently recognized that internal management projections and forecasts are of special importance to stockholders, because they contain unique insights into the value of the company that cannot be obtained elsewhere.  *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. Mar. 14, 2007) (noting that management projections are important because management has "meaningful insight into their firms' futures that the market [does] not"); *Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493, at *16 (D. Or. Mar. 20, 2017) ("The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making."). Indeed, "in a merger transaction such as that presented here, accurate financial information is necessary in order for a shareholder fairly to be able to vote…." *SEC v. National Student Marketing Corp.*, 457 F. Supp. 682, 707 (D.D.C. 1978); *see also SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (material facts "include any fact which in reasonable and objective contemplation might affect the value of the corporation's stock or securities.").

### 2.   Crucial Metrics Clarifying Morgan Stanley's Discounted Cash Flow and Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis

The Supplemental Disclosures provided material figures that were necessary for Juno stockholders to fully understand Morgan Stanley's *Discounted Cash Flow Analysis* and *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis.*

With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Supplemental Disclosures allowed stockholders to determine the fairness of the terminal value, and to understand the inputs and assumptions underlying the calculation of the Company's discount rate, which reflected Juno's estimated weighted average cost of capital and cost of equity.

The source of the discount rate range is material to Juno stockholders because faulty discount rate ranges can make merger consideration look far more attractive than it would otherwise. When a company speaks on this subject, there is a duty to do so in a non-misleading fashion. *See Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013) (finding omissions of DCF inputs material and denying motion to dismiss Section 14(a) claim) The failure to disclose the inputs a banker uses in determining its discount rates "bears materially on the decision to be made by … stockholders." *Plato Learning*, 11 A.3d at 1177-78 (enjoining the merger unless and until corrective discount rate disclosures were made).

As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion ***unless full disclosure is made of the various inputs in the valuation process, the***

> **weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78.

The Recommendation Statement stated that Juno's estimated weighted average cost of capital and cost of equity took into account "certain Juno-specific metrics, including Juno's capital structure, the cost of long-term debt, an assumed tax rate and a beta, as well as certain financial metrics for the financial markets generally."  Thus, by disclosing that Juno's cost of equity range also reflected the Company's "assumed beta as well as certain financial metrics for the financial markets generally," and that "the post-tax cost of debt used by Morgan Stanley in calculating Juno's weighted average cost of capital was 3.5% and was based on Juno's cost of long term debt as well as an assumed tax rate," Juno stockholders were able to judge for themselves the fairness of the discount rate Morgan Stanley utilized in its *Discounted Cash Flow Analysis*.

Additionally, the Recommendation Statement indicated that in order to calculate a range of implied equity values of Juno, "Morgan Stanley then multiplied the range of gross equity values of Juno by the percentage ownership retained by current stockholders after including the dilutive impact."  The Supplemental Disclosures allowed stockholders to see precisely how the implied equity values were adjusted, which is necessary to properly assess the reasonableness of the bankers' valuations.  *See* Bennett Dec., Ex. 2 at 10-11.  The Supplemental Disclosures also provided Juno shareholders with a revised chart, which also included the Company's Implied Gross Equity Value and Implied Aggregate Value.  *Id.* at 11.  Armed with this information, Juno

stockholders will be able to determine how much credence to give Morgan Stanley's *Discounted Cash Flow Analysis* when evaluating the Offer Price and deciding whether to tender their shares.

With respect to Morgan Stanley's *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*, the Recommendation Statement referenced that a sum-of-the-parts analysis had been conducted and was utilized during the negotiation process. However, the sum-of-the-parts analysis was not disclosed in the Recommendation Statement. By disclosing Morgan Stanley's *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*, Juno stockholders were provided with information that was utilized during the negotiations between Juno and Celgene, provided certain values above the deal price in the Base Case scenario and, therefore, allowed Juno stockholders the ability to determine the fairness of the implied value of the Company, and understand the adjustments made to the Company's components. *See* Bennett Dec., Ex. 2 at 11-12.

### 3. Morgan Stanley's Premiums Paid Analysis

The Supplemental Disclosures also provided meaningful clarification to Morgan Stanley's *Premiums Paid Analysis*. A premiums analysis provides the premiums received by similar companies in similar transactions, and is a fundamental valuation analysis used in assessing the fairness of a merger. *Fairness Opinions*, 55 Am. U.L. Rev. at 1574. Therefore, providing a comprehensive explanation of this information is material to stockholders. *See Glassman v. Wometco Cable TV, Inc.*, No. 7307, 1989 Del. Ch. LEXIS 1, at *15 (Del. Ch. Jan. 6, 1989) ("it would seem reasonable to expect that a shareholder might consider this [premiums] information material.").

The Recommendation Statement merely provided scant information regarding each transaction, including only the parties to each transaction and its aggregate transaction value

range between $5 billion and $20 billion, and a percentage representing the premium paid over the closing price of the target company's stock on the last trading day prior to the first public knowledge of the possibility of the transaction. However, ranges are subject to skewing by groups of extremely large or small values. Furthermore, the analysis failed to disclose each transaction's aggregate transaction value and target company's lead product. The Supplemental Disclosures provided Juno stockholders with material information to better ascertain the typical premium associated with these deals. *See* Bennett Dec., Ex. 2 at 12. By including each transaction's aggregate transaction value and target company's lead product, the Supplemental Disclosures empowered stockholders to determine the fairness of Morgan Stanley's *Premiums Paid Analysis* and compare the Offer Price to the typical premium associated with publicly traded biopharmaceutical company cash-out mergers.

**4.      The Process Leading Up to the Merger Agreement**

In the process leading up to the announcement of the Merger Agreement, the Company had already been a party to a standstill agreement with Celgene, which was later modified on January 21, 2018. However, the Recommendation Statement failed to disclose whether the non-disclosure agreements were still in effect and if the agreements contained "don't-ask-don't-waive" standstill provisions that would preclude Juno from considering potentially superior offers made by other parties interested in acquiring the Company, what changes had made to confidentiality agreement on January 21, 2018, and why Juno's board of directors decided to not engage in a market check at any point during the process leading up to the Merger Agreement. In other words, the Recommendation Statement left Juno stockholders with an incomplete picture with regard to the viability of other interested parties submitting a superior acquisition proposal. *See* Bennett Dec., Ex. 2 at 2-3.

Such information was material to Juno stockholders, as it bears directly on the Company's decision to not conduct a market check and Juno's ability to consider a potentially superior offer made by a party interested in acquiring the Company.  *See In re Celera Corp. S'holder Litig.*, 2012 Del. Ch. LEXIS 66, at *77-83 (noting how standstill provisions can be "problematic" because they foreclose interested parties from making superior offers); *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 79 (Del. Ch. 2007) (noting the significance of ensuring shareholders are aware of standstill terms and criticizing failure to "disclose [] the terms of the Standstill Agreement…"); *In re Ancestry.com, Inc. S'holder Litig.*, Consol. C.A. No. 7988-CS, at 228-29 (TRANSCRIPT) (noting the importance of complete and accurate disclosure regarding standstill provisions) (Bennett Dec., Ex. 3).

## B.      Plaintiff's Mooted Disclosure Claims Were Meritorious When Filed

"Aside from the requirement of establishing a substantial benefit, [some] courts have imposed only the additional requirement that a plaintiff must demonstrate that his complaint was 'meritorious.'"  *Lewis v. Anderson*, 692 F.2d 1267, 1270-1271 (9th Cir. 1982) (citing *Kahan*, 424 F.2d at 167).

A claim is "meritorious" within the meaning of this requirement:

> [I]f it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.

*Kahan*, 424 F.2d at 167 (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966).  "[I]n establishing a meritorious claim, petitioners need only show that their claims had some reasonable hope for success based on the pleadings."  *Cooperstock*, 820 F. Supp. at 924; *Lewis*, 692 F.2d at 1271 (the meritorious requirement "is met if the plaintiff's complaint has sufficient merit to survive a motion to dismiss on the pleadings.").  Here, as noted above, courts have

denied motions to dismiss and motions for summary judgment in actions premised upon the omission of financial projections or other metrics underlying a financial advisor's fairness opinion. *Supra* § A.1-2. As the *Brown* and *Smith* Courts held, under Section 14, "if a Proxy discloses valuation information, it must be complete and accurate." *Smith*, 969 F. Supp. 2d at 874 (citing *Brown*, 2010 U.S. Dist. LEXIS 60863 at 69-70); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001) ("With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.").

Simply put, there is no doubt that Plaintiff "had some reasonable hope for success" on his claims, *Kahan*, 424 F.2d at 167, and there is a strong likelihood Plaintiff would have prevailed on the merits of those claims had Defendants failed to moot them.

### C. Plaintiff's Counsel's Fee Motion Should Be Approved in Full Under a Lodestar/*Johnson* Factors Analysis

Where, as here, there is no "common fund" out of which attorneys' fees can be awarded, the lodestar method is the appropriate method to measure a requested fee award. *See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3rd Cir. 1998) (lodestar method appropriate "where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method."); *Wal-Mart Stores, Inc.*, 54 F.3d 69 at 73 (affirming order awarding fees for enhanced disclosure based on lodestar and multiplier).

The Fee Motion in this case is reasonable under the factors adopted by the Third Circuit Court of Appeals. *See Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 128-29 (3d Cir. 2017) (finding the District Court did not err when using the *Johnson* factors, which were not prohibited by the Supreme Court in *Perdue v. Kenny A.*, 559 U.S. 542 (2010)).

The *Johnson* factors are: (i) the time and labor required; (ii) the novelty and difficulty of the question presented by the case; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorneys due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) any time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation and ability of the attorneys; (x) the undesirability of the case; (xi) the nature and length of the professional relationship with the client, and; (xii) awards in similar cases. *Id.* at 128-29 (articulating each of the *Johnson* factors). Here, application of the relevant *Johnson* factors demonstrates that Plaintiff's Fee Motion should be granted in full.

### 1.    The Time and Labor Required

Plaintiff and Sembhi's Counsel expended a total of 178.70 hours of attorney and paralegal time in prosecuting this action, including pre-suit investigation, drafting the complaint, reviewing and analyzing relevant SEC filings, negotiating with defense counsel, drafting and filing a motion and brief for preliminary injunction, and preparing the instant motion. *See* Bennett Dec. Ex. 16, 17, 18. The work performed was necessary to protect the rights of Juno stockholders, and resulted in the Supplemental Disclosures. Further, the purpose of the fee award is to "compensate the attorney for the reasonable value of services benefiting the . . . claimant." *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corporation*, 487 F.2d 161, 167 (3rd Cir. 1973); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to 'reward counsel for undertaking socially beneficial litigation . . . in cases where the nature of the recovery does not allow the determination of the settlement's value

required for application of the percentage-of-recovery method."); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3rd Cir. 1998) (same). [8]

In calculating the lodestar amount, Plaintiff's Counsel have applied their regular hourly rates, which are reasonable for litigation of this nature and are in line with rates approved by courts within the Third Circuit in securities class actions. *Steiner v. Hercules, Inc.*, 835 F. Supp. 771, 786 (D. Del. 1993) ("In determining the 'reasonable hourly rate' by which plaintiffs' counsel should be compensated, the Court looks to the 'prevailing market rates in the relevant community'" and noting that in a securities class action suit the relevant community is the national legal community that practices securities litigation); *see Rudel Corp. v. Heartland Payment Sys.*, No. 16-2229, 2018 U.S. Dist. LEXIS 10636, at *13 (D.N.J. Jan. 22, 2018) (finding a partner hourly rate of $750 and an associate hourly rate of $450 reasonable); *In re Johnson & Johnson Derivative Litig.*, No. 10-2033(FLW), 2013 U.S. Dist. LEXIS 180822, at *231 (D.N.J. June 13, 2013) (finding hourly rates of $750 for partners and $500 for associates reasonable); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (finding rates ranging as high as $635 per hour fifteen years ago reasonable); *Reinhart v. Lucent Techs., Inc. (In re Lucent Techs., Inc. Sec. Litig.)*, 327 F. Supp. 2d 426, 443 (D.N.J. 2004) (finding an average rate of $672.50 per hour reasonable).[9]

---

[8]   *See also Kinney v. International Brotherhood of Electrical Workers*, 939 F.2d 690, 694 (9th Cir. 1991) ("Fees are allowed for fee litigation in a common benefits case because to do so furthers the purposes served by the allowance of fees on the merits."); *McCafferty v. Local 254, SEIU*, 186 F.3d 52, 62 (1st Cir. 1999) ("The principle is well established that the fee application is a necessary part of the award of attorney's fees. If the original award is warranted . . . a reasonable amount should be granted for time spent in applying for the award.").

[9]   *See also In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175, at *38-*39 (S.D.N.Y. Dec. 19, 2014) (finding the rates billed by lead counsel, which ranged from $425 to $825 per hour, were comparable to peer plaintiffs firms litigating securities class action matters); *City of Providence v. Aéropostale, Inc.*, No. 11 Civ. 7132 (CM) (GWG), 2014 U.S. Dist. LEXIS 64517, at *37-*39 (S.D.N.Y. May 9, 2014) (finding plaintiff's

### 2.    The Customary Fees in Similar Cases

The Fee Motion is reasonable and within the range for recent similar cases involving comparable federal mooted proxy disclosure issues and their associated attorney's fees.[10]   *See, e.g., Kim v. BATS Global Markets, Inc.*, 2:16-cv-02817, Stipulated Order Dismissing Action (D. Kan. Jan 13, 2017) ($350,000 for financial projections and additional information concerning financial advisor's analyses) (Bennett Dec. Ex. 4); *David Guerra v. Linear Technology Corp.*, 4:16-cv-05514, Stipulated Order Dismissing Action (N.D. Cal. Oct. 24, 2016) ($195,000 for financial projections) (Bennett Dec. Ex. 5); *Robert Berg v. Akorn, Inc.*, 1:17-cv-05016, Stipulation and Order Closing Case for All Purposes (N.D. Ill Sept 15, 2017) ($322,500 for financial projections and additional information regarding the background of the merger) (Bennett Dec. Ex. 6); *Garcia v. Kate Spade & Co*, No. 17cv4177, Letter (S.D.N.Y. Aug. 28, 2017) ($320,000 for same) (Bennett Dec. Ex. 7); *In re Time Warner, Inc. S'holder Litig.*, No. 1:17-cv-00399, Stipulation and Order Closing Case (S.D.N.Y. Mar. 1, 2017) ($240,000 for

---

counsel's rates, which ranged from $640 to $875 for partners and $335 to $665 for other attorneys, reasonable because they were in line with the rates charged by New York firms that defend class actions); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 9450, at * (S.D.N.Y. Feb. 1, 2007) (finding a partner who billed $850 per hour and a senior associate who billed at $515 per hour not inordinate for top-caliber New York law firms).

In addition, Plaintiff's Counsel's hourly rates are undoubtedly in line with or less than the rates charged by Defendants' Counsel, which is a relevant consideration.  *See Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case.  Also, when the defendant has hired expensive, out of town counsel, the plaintiffs seem justified in saying that the nature of the case required the skills of out of town specialists."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) (noting partnership level billing rates at several defense firms and finding that "[t]he current hourly rates of the partners litigating this action on behalf of the Class, who performed the vast majority of the partner-level work on this matter, range from $700 to $ 750.  Those rates fall within the norm of the rates charged by those attorneys' common adversaries in the defense bar.").

[10]    While the listed fees were agreed to by the parties, defense counsel in these actions undoubtedly sought to protect their client's interests by agreeing to the lowest reasonable fee they determined a court could award in the event the fee issue was litigated.

financial projections and additional information concerning financial advisor's analyses) (Bennett Dec. Ex. 8); *Joel Rosenfeld IRA* v. *Cynosure, Inc., et al.*, Civ. Action No. 17-10309, Stipulation and Order Closing Action (D. Mass. Feb. 5, 2018) ($300,000 for same) (Bennett Dec. Ex. 9); *Gieske v. Whole Foods Market Inc. et al.*, No. 17-cv-684, Notice (W.D. Tex. Sept. 26, 2017) ($280,000 for same) (Bennett Dec. Ex. 10).

Courts have awarded fees in cases with comparable supplemental disclosures in settlement contexts. *See Nichting v. DPL, Inc., et al.*, Consol. Case No. 3:11-cv-141, Order and Final Judgment (S.D. Ohio Feb. 24, 2012) (awarding $700,000 in fees and expenses for obtaining supplemental disclosures concerning management's financial projections and the financial advisor's financial analyses) (Bennett Dec. Ex. 11); *In re Crestwood Midstream Partners Unitholder Litig.*, No. 4:13-cv-01528, Order and Final Judgment (S.D. Tex. May 16, 2014) (Bennett Dec. Ex. 12) (awarding $595,000 in fees and expenses for obtaining supplemental disclosures concerning management's financial projections, the financial advisor's financial analyses, and the background process leading up to the merger agreement).

### 3. The Results Obtained, the Skill Requisite to Perform the Legal Service Properly, the Novelty and Difficulty of the Question Presented by the Case, the Preclusion of Other Employment, and Time Limitations

Plaintiff's Counsel pursued this action on an entirely contingent basis, and caused Defendants to disclose material information they previously withheld from Juno stockholders, including financial projections and meaningful information concerning Morgan Stanley's financial analyses and the process leading up to the Merger Agreement, which numerous courts have recognized are important for stockholders to assess the fairness of the merger consideration and exercise their corporate suffrage rights on a more informed basis. The result obtained was precisely the result Congress intended when enacting Section 14 – "prevent[ing] management or

others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Borak*, 377 U.S. at 431; *see also Wal-Mart Stores*, 54 F.3d at 71-72 ("[T]he promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue.").

With respect to the skill requisite to perform the legal service properly and the difficultly of the question presented, Plaintiff's Counsel was required to thoroughly and expeditiously review voluminous proxy statements to assess whether Defendants failed to disclose material information. Plaintiff's Counsel demonstrated skill in performing the required legal services, and thoroughly and properly analyzing complex proxy statements and valuation analyses is time-consuming and often difficult, even for those experienced in doing so.  "[B]ecause of the complexity and societal importance of shareholder and derivative litigation, the most able counsel should be obtained.  The attorney's fees awarded should reflect this goal." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 866 (E.D. Mo. 2005); *see also In re Schering-Plough Corp.*, No. 08-397 (DMC) (JAD); 2013 U.S. Dist. LEXIS 147981, at 124 (D.N.J. Aug. 27, 2013) (noting that, "by nature, securities class actions are inherently complex.").

Additionally, Plaintiff's Counsel are members of small law firms, and acceptance of this action necessarily precluded them from devoting resources to other cases.  *See Denton v. Pennymac Loan Servs., LLC*, No. 4:16cv32, 2017 U.S. Dist. LEXIS 74037, at *24 (E.D. Va. May 12, 2017) (accounting for fact that counsel "is a small law firm and thus representing a client on a contingent fee or fee-shifting basis necessarily involved loss of other opportunities."). Further, Plaintiff's Counsel was required to expeditiously review the relevant SEC filings in light of the fact they needed to ensure that the Supplemental Disclosures were made before the

Expiration Date.   Courts have recognized that counsel should not receive a lesser fee for resolving a case quickly because in many instances, such as this litigation, "it may be a relevant circumstance that counsel achieved a timely result for class members in need of immediate relief."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002).

### 4.   The Experience, Reputation, and Ability of the Attorneys

The experience, ability and reputation of Plaintiff's Counsel also supports approving the Fee Motion.   The attorneys at Monteverde & Associates PC have extensive experience in prosecuting stockholder class actions, and the firm's attorneys have obtained significant therapeutic benefits and monetary recoveries for stockholders as sole or co-lead counsel in numerous complex class actions across the country.   *See* Monteverde & Associates Firm Resume, Bennett Dec., Ex. 13; *see also* Cooch and Taylor Firm Resume, Bennett Dec., Ex. 14. Similarly, Brodsky & Smith has extensive experience in prosecuting securities class actions and shareholder derivative and merger and acquisition litigation, and has secured substantial benefits and monetary recovers while serving as lead counsel in actions across the country.   *See* Brodsky & Smith Firm Resume, Bennett Dec., Ex. 15.   The experience, reputation and ability of Plaintiff and Sembhi's Counsel supports granting Plaintiff's Fee Motion in full.

### 5.   A Reasonable Multiplier is Appropriate Because Plaintiff's Counsel Undertook Representation on a Contingent Basis

Plaintiff's Counsel respectfully submit that, consistent with the *Johnson* factors, a reasonable multiplier of 5.14 is also appropriate in this case.   "After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier.   The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."   *In re Schering-Plough/Merck Proposed Merger*, 2010 U.S. Dist. LEXIS 29121, at *55.

The Court should give considerable weight to the fact that Plaintiff's Counsel undertook representation on a contingency basis[11].  As the Fourth Circuit long ago recognized:

> The contingency of compensation . . . is highly relevant in the appraisal of the reasonableness of any fee claim. The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services.  Charges on the basis of a minimal hourly rate are surely inappropriate for a lawyer who has performed creditably when payment of any fee is so uncertain.

*McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967).   The significance of this factor has been reaffirmed on numerous occasions.  Indeed, in *In re Rite Aid Corp. Sec. Litig.*, the Third Circuit recognized that emphasized the importance of this factor and explained that "[t]he multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." 396 F.3d 294, 305-06 (3d Cir. 2005); *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117 (3d Cir. 1976) (the lodestar multiplier should reflect "[t]he risk of not recovering anything for the Class as a result of a dismissal or unfavorable verdict at trial."); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2005 U.S. Dist. LEXIS 6680, at *43 (E.D. Pa. April 18, 2005) (collecting cases and noting "[l]odestar multiples of less than four are well within the range awarded by courts in [the Third] Circuit."); *In re Suprema Specialties, Inc. Sec. Litig.*, No. 02-168 (WHW), 2008 U.S. Dist. LEXIS 26572, at *34 (D.N.J. 2008) ("In contingent litigation, lodestar multiples between 2 and 4 are routinely awarded by courts in the Third Circuit"); *In re Aetna Inc. Sec. Litig.*, No. 1219, 2001 U.S. Dist. LEXIS 68, at *49 (E.D. Pa. Jan. 4, 2001)

---

[11]   Factor 10, the undesirability of the action, is relevant only to the extent that the contingency element of this putative class action represents excessive risk for many firms.  Additionally, factor 11, the nature and length of the professional relationship with the client, should not be considered, as the litigation centered on a merger that was first announced on August 29, 2017.

(awarding a multiplier of 3.6); *In re Computron Software*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998) (upholding fee award 2.5 times the lodestar).

Moreover, other courts have similarly emphasized the significance of the risks assumed by plaintiff's counsel in contingency cases, including those cases where a resolution is achieved early in the litigation:

> Here the district court erred in basing its denial of a risk multiplier on the fact that the parties settled at a relatively early stage in the litigation. The point at which plaintiffs settle with defendants (or win a judgment against defendants) is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them . . . . when attorneys' receipt of payment is contingent on the success of the litigation, reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what the attorneys would have earned from clients who agreed to pay for services regardless of success. Thus, to account for the contingent nature of the compensation, a court should assess the riskiness of litigation.

*Skelton*, 860 F.2d at 257-58; *see also In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788 ("[T]o reward lead counsel for the favorable result achieved for the class and to provide an incentive for competent lawyers to pursue such actions in the future on an essentially contingent basis, the ultimate award must be substantially greater than the lodestar figure."); *In re Schering-Plough/Merck Merger*, 2010 U.S. Dist. LEXIS 29121 at *55-58 (applying multiplier of 2.18 in disclosure-only settlement and noting that a multiplier of 3 may be awarded even in "a simple case where no risks pertaining to liability or collection were pertinent," and that "the application of a multiplier of 2.18 is not uncommon where the lodestar method is applied.").

Plaintiff's Counsel risked receiving nothing for their work had they been unable to procure the material Supplemental Disclosures.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff respectfully request that the Fee Motion be granted.

//

//

DATED: March 2, 2018

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*

Blake A. Bennett (#5133)

**MONTEVERDE & ASSOCIATES PC**

The Brandywine Building

Juan E. Monteverde

1000 West Street, 10th Floor

Miles D. Schreiner

Wilmington, DE 19801

The Empire State Building

Tel.: (302) 984-3800

350 Fifth Avenue, Suite 4405

New York, NY 10118

Tel: (212) 971-1341

*Attorneys for Plaintiff*

Fax: (212) 202-7880

jmonteverde@monteverdelaw.com

mschreiner@monteverdelaw.com

*Attorneys for Plaintiff*

00535622

21